Jack HALEY, et al., Respondents,

v.

Estelle FORCELLE, et al., Appellants,

Dennis Forcelle, Appellant.

No. A03–182.

Court of Appeals of Minnesota.

Sept. 23, 2003.

**52**

Joseph W. Anthony, Steven M. Pincus, Anthony Ostlund & Baer, P.A., Minneapolis, MN, for respondents.

James F. Baldwin, Barry Lazarus, Philip J. Young, Moss & Barnett, P.A., Minneapolis, MN, for appellants Estelle Forcelle, et al. and Dennis Forcelle.

William Z. Pentelovitch, Maslon, Edelman, Borman & Brand, LLP, Minneapolis, MN, for appellant Dennis Forcelle.

Considered and decided by HALBROOKS, Presiding Judge, TOUSSAINT, Chief Judge, and FORSBERG, Judge.*

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn.Const. art. VI, § 10.

## OPINION

HALBROOKS, Judge.

Appellants Dennis and Estelle Forcelle challenge the district court's imposition of a temporary injunction. Appellants argue that (1) the district court abused its discretion in imposing a temporary injunction because the *Dahlberg* factors do not support injunctive relief and respondents Jack and Brenda Haley have not suffered irreparable harm; (2) respondents are prohibited from asserting a claim for equitable relief because they have unclean hands; and (3) the district court abused its discretion in ordering respondents to post a $25,000 bond. Because we conclude that the district court did not abuse its discretion in imposing the temporary injunction and that the unclean hands and adequacy of the bond issues are not properly before this court on appeal, we affirm.

## FACTS

Appellant Dennis Forcelle (Dennis) has about 40 years of experience in the manufacturing business. Several years ago, he co-founded a manufacturing company known as RMS Company. Respondents Jack Haley (Jack) and his former wife, Brenda Haley (Brenda), were both employees of Quality Components, which was a subsidiary of RMS, owned and operated by appellants Dennis and Estelle Forcelle (Estelle). Quality Components provided services for RMS. During this time, the Forcelles and Haleys came to know one another. Dennis sold his interest in RMS in 1982, but continued as its president. In 1993, Quality Components closed its doors, and the Haleys opened their own manufacturing company, J. and B. Machinery.

In 1994, an individual from Medtronic contacted Dennis. Medtronic was having manufacturing problems with one of their products and Dennis was told that he

could have the contract if he could manufacture the product in the manner that Medtronic desired it. Dennis formulated a business plan and reserved the name Stellar Technologies, Inc. with the Minnesota Secretary of State's Office.

At the time Dennis was considering forming Stellar Technologies, Inc. to take advantage of the Medtronic opportunity, he was the subject of a criminal investigation for using RMS funds to pay his personal expenses. Dennis was charged and convicted of mail fraud and interstate transportation of monies obtained by fraud. But his conviction was overturned by the Eighth Circuit Court of Appeals, and the case was remanded for a new trial. Before the second trial, Dennis pleaded guilty and served time in federal prison from May 1997 until June 1998.

Because he was under criminal investigation at the time he was exploring opportunities with Medtronic, Dennis felt he needed a "front man" who was familiar with the manufacturing business to be involved in Stellar Technologies, Inc. Dennis presented the business plan to Jack, and Jack expressed interest in being part of the new company. In April 1995, Dennis asked Jack to attend a series of meetings with Medtronic officials to discuss the manufacturing opportunity. In June 1995, the Forcelles and Haleys agreed that, instead of starting a new company from scratch, J. and B. Manufacturing would be renamed ˚Stellar Technologies, Inc. (Stellar), and the company would handle precision machining work for Medtronic. Currently, Stellar is a precision machining

company that manufactures products for the medical device industry and other industries.

Initially, Estelle received 7,000 shares of Stellar stock, Brenda received 1,500 shares, and Jack received 1,500 shares.[1] Dennis's shares were put in Estelle's name because of the ongoing criminal investigation. In August 1998, Estelle received an additional 1,173 shares in exchange for the cancellation of a $97,257.84 debt owed to her by Stellar. Accordingly, Estelle owned 8,173 shares, approximately 73% of outstanding shares, and the Haleys each owned 1,500 shares, totaling approximately 27% (13.4% each) of the outstanding shares. The parties never adopted a shareholder-control agreement.

At the February 1997 shareholders' meeting, the shareholders agreed that if any individual shareholder was required by a third party to guarantee the corporation's debts or obligations, that all shareholders would agree to co-guarantee such debt or obligation. As a result, all three shareholders personally guaranteed approximately $4.3 million of company debt. This includes approximately $3.3 million for the acquisition of capital equipment and approximately $1 million for working capital.

Brenda worked for Stellar until 1997, when she resigned. During her employment, she performed administrative tasks, worked in human resources, operated manufacturing equipment, and helped train employees. She remains a shareholder in the company.

---

1. The Haleys claim that the initial agreement was that they would receive 40% of the shares and Estelle would receive 60%. They assert that the parties agreed that the Haleys would initially receive 30% of the shares because Dennis's sister had agreed to invest $150,000 in Stellar, and, once the debt was repaid, the Haleys would receive an additional 10%. Conversely, the Forcelles assert that the agreement was that the Haleys would receive 30% of the shares and there was no agreement to give them an additional 10%. There is no evidence in the Stellar corporate documents indicating that the Haleys were entitled to an additional 10% of the outstanding shares.

Initially, Jack was chief executive officer (CEO) of Stellar and held a position on the board of directors. He led the manufacturing side of Stellar's business operations. Estelle was chief financial officer (CFO), secretary, and also held a position on the board of directors. She focused on human resources, finance, and accounting. Jack and Estelle were each initially paid $60,000 a year. In 1997, Estelle replaced Jack as CEO while retaining her positions as CFO and secretary. The board created the new position of president for Jack at a salary of $120,000 per year. In August 1998, the shareholders also voted to increase Estelle's salary to about $150,000 a year.

Dennis focused on sales and development. In 2001, the board made Dennis an officer of the company with the title of Director of New Technologies. In 2002, Dennis was elected to the Stellar board of directors; the board was then comprised of Jack, Estelle, and Dennis.

In September 2002, Dennis served Estelle with a summons and petition for marital dissolution. The litigation was emotionally charged. Estelle alleged that Dennis had an extramarital affair and that he assaulted her. She also alleged that Dennis stole Stellar records and assets. Each party alleged that the other had used company funds to pay for personal expenses. Jack filed an affidavit that supported Dennis's position in the dissolution proceeding.

Stellar needed to borrow funds in 2002. Initially, Marquette Bank agreed to make the loan, but, after the bank determined that Dennis was a convicted felon, the loan was denied. Stellar was able to obtain financing from another bank, but the new bank did not ask if Stellar had an officer or director who was a convicted felon. At this point, Estelle stated that she became concerned that having Dennis as an officer or director of the company would cause financing problems in the future. Estelle called a shareholders' meeting for February 7, 2003. Without discussion with the other shareholders, using her power as the majority shareholder, Estelle removed Dennis from the board of directors and made his position of Director of New Technologies a non-officer position. She also removed Jack from the board of directors, eliminated the position of president, and changed Jack's title to milling technician. Estelle alleged that her actions were intended to consolidate the control of Stellar during a time of financial crisis.

Estelle terminated Dennis's employment in February 2003. In explanation, she alleged that Dennis was stealing corporate assets and records and using Stellar funds to pay his personal expenses. Dennis has since been rehired by Stellar and is working on a contract basis providing consulting services.

Estelle also terminated Jack in February 2003. She asserted that Jack was using Stellar funds to pay personal expenses. She also asserted that Jack was engaging in conduct disloyal to Stellar when he allegedly told her that he would not work for her and had discussions with other Stellar managers about supporting him in a lawsuit against the company.

The Haleys filed a complaint, for themselves and on behalf of Stellar, against the Forcelles. The Haleys alleged, among other things, breach of contract, breach of fiduciary duties, and fraud and misrepresentation, and requested damages and equitable relief. The Haleys also filed a motion for a temporary restraining order or a temporary injunction, requesting that Dennis and Jack be reemployed by Stellar,[2] and that the court order a receiver to

2. The Haleys requested that Dennis be reemployed because they asserted that he was the

control Stellar's checkbook and check ledger. The district court found that (1) Jack had a reasonable expectation of lifetime employment with Stellar; (2) Dennis's affidavits provided conflicting information regarding Jack's position with the company; (3) Jack had no employment issues with Stellar until the commencement of the Forcelles' divorce; and (4) Jack seemed to be an innocent victim of the divorce. The district court granted the Haleys' motion for a temporary injunction. The court ordered Stellar to employ Jack and pay him a salary equal to Dennis's salary and in the same proportion to Estelle's salary as of October 1, 2002. The court ordered Stellar not to pay for the personal expenses of any of the parties and to make monthly accountings available to the Haleys. The court also ordered the Haleys to post a $25,000 bond. This appeal follows.

### ISSUES

1. Did the district court abuse its discretion by granting the Haleys' motion for a temporary injunction?

2. Are the Haleys prohibited from asserting a claim for equitable relief because they have unclean hands?

3. Did the district court abuse its discretion by ordering the Haleys to post only a $25,000 bond?

### ANALYSIS

#### I.

 Estelle, Dennis, and Stellar (collectively "appellants") argue that the district court abused its discretion by granting the Haleys' motion for a temporary injunction. "A decision on whether to grant a temporary injunction is left to the discretion of the trial court and will not be

driving force behind the company and that the company would suffer without him. Dennis was rehired by Stellar on a contract basis

overturned on review absent a clear abuse of that discretion." *Carl Bolander & Sons Co. v. City of Minneapolis,* 502 N.W.2d 203, 209 (Minn.1993) (citations omitted). A district court's findings regarding entitlement to injunctive relief will not be set aside unless clearly erroneous. *LaValle v. Kulkay,* 277 N.W.2d 400, 402 (Minn.1979).

 "A temporary injunction is an extraordinary remedy." *Miller v. Foley,* 317 N.W.2d 710, 712 (Minn.1982). "Its purpose is to preserve the status quo until adjudication of the case on its merits." *Id.* (citation omitted). The grant of a temporary injunction does not establish the law of the case or constitute an adjudication on the merits. *Metro. Sports Facilities Comm'n v. Minn. Twins P'ship,* 638 N.W.2d 214, 220 (Minn.App.2002), *review denied* (Minn. Feb. 4, 2002) *(Twins).*

 In determining whether the district court abused its discretion, we consider the following five factors:

(1) The nature and background of the relationship between the parties preexisting the dispute giving rise to the request for relief.

(2) The harm to be suffered by the plaintiff if the temporary restraint is denied as compared to that inflicted on the defendant if the injunction issues pending trial.

(3) The likelihood that one party or the other will prevail on the merits when the fact situation is viewed in light of established precedents fixing the limits of equitable relief.

(4) The aspects of the fact situation, if any, which permit or require consideration of public policy expressed in the statutes, State and Federal.

before the court ordered the injunction. Thus, the issue of his reemployment became moot.

(5) The administrative burdens involved in judicial supervision and enforcement of the temporary decree.

*Dahlberg Bros., Inc. v. Ford Motor Co.,* 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965) (footnotes omitted).

## A. Background

■ The parties in this case are related in many different ways. They worked together as employees of the same company. When Stellar began and Jack was CEO, the Forcelles both reported to him. Later, when Estelle was CEO and Jack was president, he reported to her. For much of Stellar's existence, Jack and Estelle have been the only directors on Stellar's board. Dennis was also on Stellar's board of directors for a short time starting in 2002. The parties are also related as joint guarantors of about $4.3 million in Stellar debt. But, most significantly, the parties, not including Dennis, are related as shareholders of a closely held corporation. The relationship between shareholders of a closely held corporation is analogous to the relationship between partners in a partnership. *Pedro v. Pedro,* 463 N.W.2d 285, 288 (Minn.App.1990), *review denied* (Minn. Jan. 24, 1991). Each shareholder in a closely held corporation owes the other a fiduciary duty. *Id.* Thus, the parties in this case were related as co-workers, supervisors/supervisees, corporate officers, directors, guarantors of corporate debt, shareholders of a closely held corporation, and fiduciaries.

## B. Balancing of Harms

### 1. Harm to the Haleys

■ The Forcelles argue that the district court abused its discretion by granting the Haleys' motion for a temporary injunction because the Haleys were not subject to irreparable injury. The district court found that Jack was not a wealthy man and that he needed an income to support his family and himself. The court noted that the record contains evidence that the Forcelles were aware of Jack's financial condition and felt that they could pressure Jack into selling his shares back to Stellar by altering his employment status. The court held that the Forcelles' effort to force Jack to sell his shares constituted a severe hardship for him, who had invested a significant amount of time and energy into Stellar.

■ A party seeking an injunction must demonstrate that legal remedies are inadequate and that an injunction is necessary to prevent great and irreparable injury. *Twins,* 638 N.W.2d at 222. Generally, the injury must be of such a nature that money damages alone would not provide adequate relief. *Morse v. City of Waterville,* 458 N.W.2d 728, 729–30 (Minn.App. 1990), *review denied* (Minn. Sept. 28, 1990). " '[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.' " *Miller,* 317 N.W.2d at 713 (quoting *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974)) (other quotations omitted). Further, insufficiency of savings or difficulty in obtaining other employment generally will not support a finding of irreparable injury. *Id.* A lack of irreparable injury may be a sufficient ground for showing that a district court abused its discretion in granting a temporary injunction. *Twins,* 638 N.W.2d at 222. However, irreparable injury is not always susceptible of precise proof. *Id.*

Here, there is little doubt that Jack will be harmed as a result of being terminated from Stellar. There is evidence that he will suffer financially and that he and his ex-wife may be forced to sell their Stellar shares. But, the issue in this case is not whether Jack will be harmed. The issue is whether Jack will be irreparably harmed

such that legal remedies would not provide him with adequate relief and the extraordinary relief of a temporary injunction is warranted before the case is adjudicated on the merits. We agree with the Forcelles that the loss of income and other effects of being terminated from a job are generally insufficient to demonstrate irreparable injury, because money damages will likely provide adequate relief. *See Morse*, 458 N.W.2d at 730 (finding no irreparable harm to suspended city clerk who would be entitled to back pay and reinstatement if she prevailed on her claims). Thus, if, as the Forcelles assert, the Haleys' claim is simply an employment-termination claim, it would appear that the district court abused its discretion by granting the Haleys injunctive relief.

■ But there is other evidence in this case that distinguishes it from typical employment-termination cases. Here, the evidence shows that Jack was more than a Stellar employee. He and his ex-wife were co-founders of Stellar along with the Forcelles.[3] They were also shareholders and, until his termination, Jack was a corporate officer, director, and shareholder. The evidence shows that he led the manufacturing side of Stellar's business[4] and dedicated his time and efforts to his work at Stellar, knowing that he and his ex-wife owned about 27% of the company. As

shareholders, the Haleys also agreed to jointly guarantee loans for Stellar totaling about $4.3 million that were used as operating capital and to buy equipment. Thus, when Jack was terminated, not only did he lose his sole source of income for his family, he also lost the ability to manage and watch over the company that he helped to found and partially owned. In addition, he lost the ability to see that the funds loaned to Stellar in his name were used for their intended purpose and that he and his ex-wife would not be held responsible for guaranteeing loans for a company that they had no ability to control. Furthermore, there was a high likelihood that the financial hardship of being terminated would squeeze the Haleys financially and force them to sell their shares in Stellar against their wishes. As a result, the injury from Jack's termination includes the loss of the ability to work for his company and earn a living, but also extends to the loss of the ability to have a voice in management and to protect his ex-wife's and his interests in the company for which they have guaranteed $4.3 million in loans and worked to grow and operate.

■ The fact that the Stellar shareholders did not have a shareholder-control agreement assuring the rights of minority shareholders seems important to note.

3. Forcelles assert that the district court's finding that the Haleys were founders of Stellar is clearly erroneous. The evidence shows that it was the company started by the Haleys, J. and B. Machining, which was renamed and turned into Stellar Technologies, Inc. The evidence also shows that, while Dennis may have been the motivating force behind Stellar, Jack attended the initial meetings with Medtronic and was Stellar's first CEO. While the Haleys did not contribute a substantial amount of capital to Stellar, they did contribute two machines, which the company could depreciate, and their time and effort. The Haleys also agreed to guarantee $4.3 million in Stellar debt. On this record, we conclude that the district court's finding that the Haleys were co-founders of Stellar is not clearly erroneous.

4. Forcelles assert that Jack played an insignificant role in Stellar's operations and growth. But, as the district court found, the affidavits submitted by the Forcelles in this case contradict the affidavits they submitted in their marital dissolution proceeding as to the significance of Jack's involvement in Stellar's operations. We conclude that the district court's finding that the Forcelles' affidavits are contradictory is not clearly erroneous.

Thus, it may be argued that, as minority shareholders without the protection of a shareholder agreement, the Haleys had no right to reasonably expect continued employment, or continued participation in Stellar's management. But, in close corporations, the expectations of shareholders are not always encompassed in written agreements and written agreements are not always dispositive of shareholder expectations. *Gunderson v. Alliance of Computer Prof'ls, Inc.*, 628 N.W.2d 173, 186 (Minn.App.2001), *review granted* (Minn. July 24, 2001), *and appeal dismissed* (Minn. Aug. 17, 2001). Based on this record, we conclude that the district court did not abuse its discretion by determining that the Haleys would be subject to irreparable injury if injunctive relief was not ordered.

### 2. Harm to the Forcelles

██ The primary harm to the Forcelles as a result of the injunction appears to be the interference with Estelle's right to manage the operations and affairs of Stellar as she sees fit as the company's majority shareholder, CEO, and sole director. Minnesota courts are generally reluctant to interfere with corporate decision-making. *Potter v. Pohlad*, 560 N.W.2d 389, 392 (Minn.App.1997) (noting that the rationale for the business-judgment rule is that courts are generally ill-equipped to second-guess the business decisions made by corporate professionals), *review denied* (Minn. June 11, 1997). On this record, however, we conclude that any harm due to inference with Estelle's decision-making power is outweighed by the harm that may have befallen the Haleys if a temporary injunction had not been issued.

### C. Likelihood of Prevailing on the Merits

██ The Forcelles argue that the district court abused its discretion by concluding that there was sufficient likelihood that the Haleys would prevail on the merits of their claims. The district court noted that shareholders of closely held corporations owe each other a fiduciary duty and held that the Haleys were likely to prevail on the merits of their claims because they were minority shareholders who appeared to have been forced out for inequitable reasons. A district court errs in granting temporary injunctive relief if a plaintiff can show no likelihood of prevailing on the merits. *Twins*, 638 N.W.2d at 226. "But if a plaintiff makes even a doubtful showing as to the likelihood of prevailing on the merits, a district court may consider issuing a temporary injunction to preserve the status quo until trial on the merits." *Id.* (citation omitted).

The Haleys, on behalf of themselves and Stellar, asserted 14 different causes of action against the Forcelles. The parties focus on the Haleys' claim that they are entitled to relief under Minn.Stat. § 302A.751 (2002) because Estelle engaged in unfairly prejudicial conduct toward Jack.

Minn.Stat. § 302A.751, subd. 1(b)(3), states:

A court may grant any equitable relief it deems just and reasonable in the circumstances or may dissolve a corporation and liquidate its assets and business:

. . . .

(b) In an action by a shareholder when it is established that:

. . . .

(3) the directors or those in control of the corporation have acted in a manner unfairly prejudicial toward one or more shareholders in their capacities as shareholders or directors of a corporation that is not a publicly held corporation, or as

officers or employees of a closely held corporation.

Minn.Stat. § 302A.751, subd. 3a, provides further that, in considering whether to grant relief under the statute, courts should consider

> the duty which all shareholders in a closely held corporation owe to one another to act in an honest, fair, and reasonable manner in the operation of the corporation and the reasonable expectations of all shareholders as they exist at the inception and develop during the course of the shareholders' relationship with the corporation and with each other.

Additionally, Minn.Stat. § 302A.467 provides that

> [i]f a corporation or an officer or director of the corporation violates a provision of this chapter, a court in this state may, in an action brought by a shareholder of the corporation, grant any equitable relief it deems just and reasonable in the circumstances and award expenses, including attorneys' fees and disbursements, to the shareholder.

The legislature enacted Minn.Stat. § 302A.751 in 1981 in an effort to provide some protection for minority shareholders in closely held corporations, because there tends to be a lack of a ready market for them to sell their shares. *Gunderson,* 628 N.W.2d at 184.

> Although the statute does not define the phrase "in a manner unfairly prejudicial toward ... shareholders," we have interpreted the phrase to mean conduct that frustrates the reasonable expectations of all shareholders in their capacity as shareholders or directors of a corporation that is not publicly held or as

officers or employees of a closely held corporation.

*Id.* (citation omitted).

In the absence of a specific agreement, a shareholder's reasonable expectations are determined by examining the understanding that objectively reasonable close-corporation shareholders would have reached if they had bargained over how their investments should be protected when the venture began. *Id.* at 186. Shareholders in a closely held corporation typically have an expectation of continuing employment, and the discharge of a shareholder-employee may be grounds for equitable relief under Minn.Stat. § 302A.751. *Id.* at 189; *see also Gigax v. Repka,* 83 Ohio App.3d 615, 615 N.E.2d 644, 650 (1992) (holding that the discharge of a minority shareholder/employee of closely held corporation constituted a breach of the majority shareholders' fiduciary duty because the discharge was not based on a legitimate business reason).

The threshold issue in a claim of shareholder oppression based on termination of employment is whether the minority shareholder had a reasonable expectation of continued employment. *Gunderson,* 628 N.W.2d at 190. Factors to be considered in determining whether a shareholder's expectation of continued employment are reasonable include whether (1) the shareholder made a capital investment in the company; (2) continued employment could be considered part of the shareholder's investment; (3) the shareholder's salary could be considered a de facto dividend; and (4) continued employment was a significant reason for making the investment. *Id.* at 191. Further, the shareholder's expectation of continued employment is only reasonable if that expectation is known and accepted by other shareholders and properly balanced against the majority or controlling

shareholders' need for flexibility in running the business. *Id.* Oppression liability does not arise and a shareholder's expectation of continued employment is not reasonable when the employee-shareholder is terminated for misconduct or incompetence. *Id.* at 192.

Here, the district court found that Jack's termination was not the result of incompetence or his inability to perform his duties as president of Stellar, as suggested by the Forcelles, but the result of Estelle's bitter feelings toward him because Jack supported Dennis in the Forcelles' divorce proceedings. The district court discounted the affidavits submitted by the Forcelles in this case, which state emphatically that Jack was unable to perform his duties and that he was an at-will employee, because those affidavits were contradicted in many ways by the affidavits previously submitted by the Forcelles in their marital-dissolution proceedings. The earlier Forcelle affidavits are part of the district court's record in this matter.

The Haleys cite to many examples of inconsistencies in the Forcelles' affidavits in their brief. For example, in an affidavit submitted in this case, Dennis states that he made it clear to Jack that Jack had no promise of continued employment and that he was an at-will employee. But, in his affidavit submitted during the divorce proceeding, Dennis explains that the parties had an agreement that Brenda and Estelle would work for Stellar for three years with Jack and Dennis, and then Brenda and Estelle would quit and he and Jack would continue to work in the business. In another affidavit submitted in the dissolution proceedings, Dennis stated that he and Jack had an agreement that they would always earn the same salary. The affidavits are also contradictory with regard to the Forcelles' assessment of Jack's leadership abilities and ability to perform his duties. Based on this record, the district court's decision to discount the affidavits submitted by the Forcelles in this case was not clearly erroneous.

Jack's expectation of continued employment also seems reasonable based on the Haleys' agreement to jointly guarantee $4.3 million in Stellar loans with the Forcelles. It is unlikely that Jack would have agreed to personally guarantee company debt if he did not expect to have a continued role in the operations and management of the company. The Forcelles and Haleys also contemplated that Dennis and Jack would have continued employment with Stellar, and that their salaries would always be equal, which could be considered a de facto dividend on their investment in the company. Based on this record, we conclude that the district court did not abuse its discretion in holding that there was a likelihood that the Haleys would prevail on their claim that they are entitled to relief under Minn.Stat. § 302A.751.

## D. Public Policy

As the district court concluded, the primary issue of public policy in this case appears to be striking the proper balance between minority-shareholder rights and the rights of majority shareholders to run the business as they see fit. While cognizant of the potentially competing interests to be balanced, the district court carefully looked at this matter and weighed the respective interests. The district court did not abuse its discretion by determining that public policy considerations did not prevent the issuance of a temporary injunction to preserve the status quo and to protect the Haleys' interests as minority shareholders until the case can be adjudicated on its merits.

## E. Administration of the Remedy

■ As a final factor in its decision whether to issue a temporary injunction, the district court considered the amount of supervision required to enforce the temporary injunction. The court stated that little supervision would be required to enforce the temporary injunction and found that the requirements of the temporary injunction were not particularly burdensome and did not require much of either party. Forcelles do not dispute the court's conclusion on this factor. We conclude that the district court did not abuse its discretion in holding that the amount of administrative supervision did not prevent the issuance of a temporary injunction.

## II.

■ The Forcelles argue that the district court abused its discretion by granting a request for equitable relief to a party with unclean hands. The Forcelles included an unclean-hands defense in their answer to the Haleys' complaint. But they did not present this theory to the district court in their memorandum in opposition to the Haleys' motion for a temporary injunction, so the district court made no findings and did not consider the unclean-hands defense in its order or memorandum. Generally, this court will not consider matters that were not argued and considered in the court below. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988). Therefore, we conclude that the issue is not properly before this court on appeal.

## III.

■ Finally, the Forcelles argue that the district court abused its discretion by ordering the Haleys to post only a $25,000 bond as security for the temporary injunction. A challenge to the adequacy of a bond must first be raised and addressed by the district court. *Silver Bay Area Citizens Concerned for Quality Educ. v. Lake Superior Sch. Dist. No. 381*, 448 N.W.2d 92, 96 (Minn.App.1989), *review denied* (Minn. Jan. 23, 1990). The Forcelles did not raise the issue of the adequacy of the $25,000 bond before the district court and the district court did not address this issue. Thus, we conclude that this issue is not properly before this court on appeal.

## DECISION

The district court did not abuse its discretion in imposing a temporary injunction. Because the unclean-hands and adequacy-of-the-bond issues were not presented to or addressed by the district court, those issues are not properly before this court on appeal.

**Affirmed.**

Dissenting, FORSBERG, Judge.

FORSBERG, Judge (dissenting).

I respectfully dissent. Unlike the majority, I believe the district court abused its discretion in granting respondents' motion for temporary injunctive relief because respondents failed to show that they were subject to irreparable harm. "The party seeking an injunction must establish that legal remedies are inadequate and that an injunction must issue to prevent great and irreparable injury." *Metro. Sports Facilities Comm'n v. Minn. Twins P'ship*, 638 N.W.2d 214, 222 (Minn.App. 2002), *review denied* (Minn. Feb. 4, 2002). The loss of income and financial hardship resulting from the termination of an employment relationship generally does not

constitute irreparable injury sufficient to provide a basis for temporary injunctive relief. *Miller v. Foley*, 317 N.W.2d 710, 713 (Minn.1982) (stating that insufficiency of savings is common for most discharged employees and will not support a finding of irreparable injury).

This case is nothing more than a typical employment matter. Jack Haley is used to a certain lifestyle and has certain financial obligations that he must fulfill. Clearly, his termination and the accompanying loss of income would affect his ability to maintain his lifestyle and meet his financial obligations. But Jack Haley's financial hardship is insufficient to demonstrate irreparable injury.

Respondents assert that this case is more than an employment matter because the Haleys would be left with no voice in management, no role as employees, and no way to protect their interests in Stellar Technologies, Inc. But, forcing Stellar to pay Jack Haley a salary until trial does not give him a voice in management or a way to protect his or his ex-wife's interest in Stellar. It only relieves Jack Haley of the financial hardship of his termination. Temporary injunctive relief is not an appropriate remedy to relieve him of the financial hardship of his termination because there is an adequate remedy at law in the form of money damages at trial.

On this record, unlike the majority, I would reverse the district court and conclude that the court abused its discretion in granting respondents' motion for injunctive relief because respondents failed to demonstrate that they were subject to irreparable harm.